**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RICHARD BERDAN, derivatively on behalf of KENVUE INC. | |
| Plaintiff, | **Case No.:** 2:24-CV-108 |
| vs. | |
| JOHNSON & JOHNSON, THIBAUT MONGON, PAUL RUH, HEATHER HOWLETT, RICHARD E. ALLISON, JR., PETER M. FASOLO, TAMARA S. FRANKLIN, SEEMANTINI GODBOLE, MELANIE L. HEALEY, BETSY D. HOLDEN, LARRY MERLO, VASANT PRABHU, MICHAEL E. SNEED, and JOSEPH J. WOLK, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| KENVUE INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Richard Berdan ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Kenvue Inc. ("Kenvue" or the "Company"), files this Verified Shareholder Derivative Complaint against Johnson & Johnson ("J&J"), Thibaut Mongon ("Mongon"), Paul Ruh ("Ruh"), Heather Howlett ("Howlett"), Richard E. Allison, Jr. ("Allison"), Peter M. Fasolo ("Fasolo"), Tamara S. Franklin ("Franklin"), Seemantini Godbole ("Godbole"), Melanie L. Healey ("Healey"), Betsy D. Holden ("Holden"), Larry Merlo ("Merlo"), Vasant Prabhu ("Prabhu"), Michael E. Sneed ("Sneed"), and Joseph J. Wolk ("Wolk") (collectively, the "Individual Defendants," and together with Kenvue, the "Defendants") for breaches of their

fiduciary duties as directors and/or officers of Kenvue, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kenvue, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Kenvue's directors and officers from January 4, 2023 through September 12, 2023, inclusive (the "Relevant Period").

2.      Kenvue is a Delaware corporation with principal executive offices at 199 Grandview Road, Skillman, NJ 08558. Kenvue's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KVUE." The Company is a consumer health company with three divisions: skin health & beauty; essential health; and self care.

3.      Kenvue describes itself as "the world's largest pure-play consumer health company by revenue and hold a unique position at the intersection of healthcare and consumer goods." The Company boasts "iconic" brands including Aveeno®, BAND-AID® Brand Adhesive Bandages, Johnson's®, Listerine®, Neutrogena®, and Tylenol®.

4.      On November 12, 2021, J&J announced it was spinning off its consumer health division into a separate company because of conflicts of interest between J&J's health offerings compared to those in the consumer health division. Because Kenvue was a spinoff of J&J, consumers and the investing public were already familiar with many of Kenvue's products, and as such, relied on prior statements made by J&J regarding the safety and efficacy of those products.

5.      As aforementioned, Kenvue assumed the operations of well-known brands including Aveeno, Band-Aid, Neutrogena, and Tylenol, among others. Of particular issue were widely used over-the-counter medicines that contained the ingredient phenylephrine ("PE"). PE is a common ingredient in decongestant medicines. PE became increasingly popular following the Combat Methamphetamine Epidemic Act of 2005, which restricted sales of medicines containing pseudoephedrine—a commonly used ingredient in illegal methamphetamine production.

6.      On May 4, 2023, Kenvue held its initial public offering ("IPO") and issued 1.89 billion shares, of which approximately 170 million were offered at the IPO. Accordingly, J&J retained about 89.6% of Kenvue's shares following the IPO and was deemed a controlling shareholder under SEC regulations.

7.      On August 23, 2023, Kenvue and J&J completed the spin-off transaction where Kenvue exchanged 190,955,436 shares of J&J for 1,533,830,450 shares of Kenvue common stock. Following this transaction, J&J's interest in Kenvue was reduced to approximately 9.5% of Kenvue's outstanding shares.

8.      On September 12, 2023, the Food and Drug Administration ("FDA") published its findings regarding the use of PE as a nasal decongestant (the "Findings"). In its publication, the FDA stated that it convened an advisory committee to "discuss the adequacy of efficacy data available for orally administered [PE] as a nasal decongestant and where the oral nasal

decongestants phenylephrine hydrochloride and phenylephrine bitartrate should be reclassified as Generally Recognized as Safe and Effective (GRASE) due to lack of efficacy."

9.      The effectiveness of over-the-counter drugs is defined in 21 CFR § 330.10(a)(4)(ii) as "a reasonable expectation that, in a significant proportion of the target population, the pharmacological effect of the drug, when used under adequate directions for use and warnings against unsafe use, will provide clinically significant relief of the type claims."

10.     The FDA concluded that following a "thorough review of all those data" related to the efficacy of oral PE as a nasal decongestant, it would no longer label products containing PE as GRASE. While there were no safety issues found with the use of oral PE as a decongestant, the FDA panel unanimously found that there were also no benefits.

11.     On this news, Kenvue's stock price fell from a closing price of $22.07 per share on September 11, 2023 to a closing price of $21.06 per share on September 12, 2023. This represented a decline of $1.01 per share, or 4.58%. Kenvue's common stock has yet to recover to its IPO issuing price of $22 per share since this news.

12.     Throughout the Relevant Period, the Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Kenvue's business, operations, and prospects. In particular, Defendants failed to disclose to shareholders and investors that: (1) the Company faces potential headwinds because of the FDA's concerns about PE's ineffectiveness; (2) the Company did not discuss or disclose the risks related to the efficacy of PE in its IPO, even though questions regarding its efficacy have been prevalent since 2007; (3) the Company failed to disclose specific risks relating to potential litigation stemming from adverse findings on PE; (4) the Company failed to maintain internal controls; and (5) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects

were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

13.    In light of the Individual Defendants' misconduct—which has subjected the Company, its former controlling shareholder, and its Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Chief Accounting Officer ("CAO") to two federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey (the "Securities Class Actions") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) and 21D of the Securities Act and

raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Kenvue. Plaintiff has continuously held Kenvue common stock since the time of the alleged wrongdoing, and has owned J&J common stock, the parent company of Kenvue, prior to the IPO.

### Nominal Defendant Kenvue

21.     Kenvue is a Delaware corporation with principal executive offices at 199 Grandview Road, Skillman, New Jersey 08558. Kenvue's common stock trades on the NYSE under the symbol "KVUE."

### Defendant Johnson & Johnson

22.     Defendant J&J is the former parent company and former controlling shareholder of Kenvue. J&J is incorporated in New Jersey and has principal executive offices at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

23.     Kenvue was a spinoff of J&J's consumer health segment. Additionally, Kenvue was a wholly-owned subsidiary of J&J until its IPO on May 4, 2023. Following the IPO, J&J owned 89.9% of Kenvue common stock and self-admitted it was the controlling shareholder of Kenvue until the companies agreed to a stock agreement which was executed on August 23, 2023. Following the stock agreement, J&J now owns just under 10% of outstanding shares of Kenvue.

**Defendant Mongon**

24.     Defendant Mongon is the CEO of Kenvue and a member of its Board of Directors. Previously, Defendant Mongon served as the Executive Vice President and Worldwide Chairman, Consumer Health at J&J. According to the Prospectus filed with the SEC pursuant to Rule 424(b)(3) on September 18, 2023 (the "Prospectus"), as of August 25, 2023, Defendant Mongon beneficially owns 432,986 shares of Kenvue common stock. Given that the price per share of Kenvue common stock at the closing of trade on August 25, 2023 was $22.97, Defendant Mongon owns approximately $9.94 million worth of Company common stock.

25.     According to the Prospectus, in 2022 Defendant Mongon received $7,092,410 million in total compensation from the Company. This included $917,308 in salary, $3,671,233 in stock awards, $1,436,969 in option awards, $789,000 in non-equity incentive compensation, $62,000 in change in pension value and non-qualified deferred compensation earnings, and $196,900 in all other compensation. Additionally, the Prospectus provides that for 2023, Defendant Mongon will receive approximately $12,437,000 in total compensation from the Company. This will include $1,250,000 in salary, $2,125,000 in target annual incentive, and $9,062,500 in target long-term incentive.

26.     The Prospectus states the following about Defendant Mongon:

*Thibaut Mongon* has served as Chief Executive Officer and Director of Kenvue as a public company since May 2023. Mr. Mongon joined Johnson & Johnson in 2000

as Director of Marketing for the Vision Care group in France and subsequently held positions of increasing responsibility until he transitioned to the Pharmaceutical sector in 2012, as the Global Commercial Strategy Leader for the Neuroscience therapeutic area. Mr. Mongon joined the Consumer Health sector of Johnson & Johnson in 2014 as Company Group Chairman Asia-Pacific and was promoted to Executive Vice President and Worldwide Chairman, Consumer Health at Johnson & Johnson in 2019. Prior to joining Johnson & Johnson, Mr. Mongon worked for Bormioli in Italy and Danone in France. Mr. Mongon currently serves on the board of directors of The Consumer Goods Forum and is a member of the Business Roundtable. Mr. Mongon holds a degree in Marketing from KEDGE Business School and an MBA degree from INSEAD. Mr. Mongon brings to Kenvue's board of directors a deep understanding of the Consumer Health Business and commitment to innovation, complemented by extensive international experience, a consumer-centric mindset and considerable expertise in business strategy.

**Defendant Ruh**

27.     Defendant Ruh serves as the Company's CFO. Previously, Defendant Ruh served as the CFO of Johnson & Johnson Consumer Health. Defendant Ruh's share ownership is not reported in the Prospectus.

28.     According to the Prospectus, Defendant Ruh received $1,648,167 in total compensation from the Company. This included $509,670 in salary earned, $269,352 in annual incentive, and $809,100 in long term incentive. The Prospectus also projects that for 2023 Defendant Ruh's target compensation is set at $3,400,000 in total direct compensation. This will likely include $680,000 in salary, $680,000 in target annual incentives, and $2,040,000 in target long-term incentive.

29.     The Prospectus states the following about Defendant Ruh:

Paul Ruh has served as Chief Financial Officer of Kenvue as a public company since May 2023. Mr. Ruh previously served as Chief Financial Officer, Consumer Health at Johnson & Johnson, where he is a member of the Consumer Health Leadership Team. Mr. Ruh has more than 30 years of experience building global consumer brands. Prior to joining Johnson & Johnson in 2017, Mr. Ruh worked at PepsiCo, where he started as Director of Strategy and Planning and proceeded to hold several financial leadership positions, including CFO of Latin America, CFO of PBA and CFO of PepsiCo Foodservice. Prior to joining PepsiCo, Mr. Ruh worked at McKinsey & Company as a member of the Corporate Finance Practice

in Mexico City and Santiago de Chile and as a manager at Procter & Gamble in Financial Analysis, Product Supply Finance and Treasury in Mexico City. Mr. Ruh holds an MBA degree from the MIT Sloan School of Management and a B.S. degree in Engineering from Ibero-American University in Mexico City.

**Defendant Howlett**

30.     Defendant Howlett serves as CAO of Kenvue. According to her personal LinkedIn profile, Defendant Howlett had been the CAO Designate of Kenvue since September 2022. At the time of the IPO, Defendant Howlett signed the Company's registration statement on Form S-1 that was filed with the SEC on January 4, 2023 (the "Registration Statement").

**Defendant Allison**

31.     Defendant Allison has served as a Company director since the close of the IPO on May 8, 2023. As a member of the Board, Defendant Allison serves as a member of both the Audit Committee and the Compensation & Human Capital Committee ("Compensation Committee"). According to the Prospectus, as of August 25, 2023, Defendant Allison beneficially owns 33,218 shares of Company common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Allison owns approximately $763,017.46 worth of Company stock.

32.     The Prospectus states the following about Defendant Allison:

*Richard E. Allison, Jr.* has served as a Director of Kenvue since May 2023. Mr. Allison served as Chief Executive Officer and as a board member of Domino's Pizza, Inc. from 2018 to 2022. He previously served as President of Domino's International and as Executive Vice President of Domino's International. Prior to joining Domino's, Mr. Allison worked at Bain & Company, Inc. for over 13 years, serving as a Partner from 2004 to 2010, and as coleader of Bain's restaurant practice. He currently serves as a board member for Starbucks Corporation. Mr. Allison holds a B.S. degree in Business Administration from the University of North Carolina at Chapel Hill and an MBA degree from the University of North Carolina's Kenan-Flagler Business School, where he serves on the Board of Advisors. Mr. Allison brings to Kenvue's Board of Directors significant experience in executive leadership and a deep understanding of business strategy, operational management and market development that are crucial in steering global brands.

**Defendant Fasolo**

33.     Defendant Fasolo has served as a Company director since the end of the IPO on May 8, 2023. According to the Prospectus, as of August 25, 2023, Defendant Fasolo beneficially owns 9,483 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Fasolo owns approximately $217,824.51 worth of Company stock.

34.     The Prospectus states the following about Defendant Fasolo:

*Peter M. Fasolo* has served as a Director of Kenvue since May 2023. Dr. Fasolo has served as Executive Vice President, Chief Human Resources Officer of Johnson & Johnson since 2016. He is also a member of Johnson & Johnson's Executive Committee, Management Compensation Committee and Chairman of Johnson & Johnson's Pension and Benefits Committee. Dr. Fasolo first joined Johnson & Johnson in 2004 as Worldwide Vice President, Human Resources for Cordis Corporation and was subsequently named Vice President, Global Talent Management of Johnson & Johnson. He left Johnson & Johnson in 2007 to join Kohlberg Kravis Roberts & Co. (KKR) as Chief Talent Officer for the North America portfolio companies owned by the firm. He returned to Johnson & Johnson in September 2010 as Vice President, Global Human Resources. Prior to his career at Johnson & Johnson, Dr. Fasolo spent 13 years with BristolMyers Squibb in executive-level human resource roles in the pharmaceutical, medical devices and consumer segments. Dr. Fasolo currently serves on the boards of the Human Resources Policy Association, Tufts University and Save the Children and is a Fellow of the National Academy of Human Resources. He served as a board member for HireRight Holdings Corporation from 2018 to 2023. Dr. Fasolo holds a B.A. degree in Psychology from Providence College, an M.A. degree in Industrial Psychology from Fairleigh Dickinson University and a Ph.D. degree in Organizational Behavior from the University of Delaware. Dr. Fasolo brings to Kenvue's Board of Directors a deep understanding of the Consumer Health Business through his senior leadership positions at Johnson & Johnson as well as extensive experience in business transformation and human capital management, including global talent, recruiting, diversity and inclusion, compensation, benefits and employee relations.

**Defendant Franklin**

35.     Defendant Franklin has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Franklin serves on the Audit Committee

and Nominating, Governance & Sustainability Committee. According to the Prospectus, as of August 25, 2023, Defendant Franklin beneficially owns 7,620 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Franklin owns approximately $175,031.40 worth of Company stock.

36.    The Prospectus states the following about Defendant Franklin:

*Tamara S. Franklin* has served as a Director of Kenvue since May 2023. Ms. Franklin served as Chief Digital, Data and Analytics Officer of Marsh LLC from 2020 to 2023. She previously served as Chief Digital Officer and Vice President, Media and Entertainment, North America for International Business Machines Corporation and Executive Vice President, Digital for Scripps Networks Interactive, Inc. Ms. Franklin has significant experience leading digital businesses, including previous leadership roles at Motorola, Inc. and Turner Broadcasting System, Inc. She currently serves as a board member for Genpact Limited, a global professional services firm that specializes in digital-led business transformations. She also serves on the boards of Dream Academy and the Arts Council of Princeton. Ms. Franklin holds a B.A. degree in English from Yale University and an MBA degree from Harvard University. Ms. Franklin brings to Kenvue's Board of Directors proven expertise in leading digital transformation initiatives across technology, data and analytics workstreams in large multinational organizations, complemented by her deep understanding of executive leadership and business strategy.

**Defendant Godbole**

37.    Defendant Godbole has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Godbole serves as a member of the Audit Committee and as a member of the Nominating, Governance & Sustainability Committee. According to the Prospectus, as of August 25, 2023, Defendant Godbole beneficially owns 7,620 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Fasolo owns approximately $175,031.40 worth of Company stock.

38.    The Prospectus states the following about Defendant Godbole:

*Seemantini Godbole* has served as a Director of Kenvue since May 2023. Ms. Godbole serves as Executive Vice President, Chief Digital and Information Officer of Lowe's Companies, Inc. Prior to joining Lowe's in 2018, she served as Senior Vice President, Digital and Marketing Technology of Target Corporation. Ms. Godbole has more than 25 years of global technology experience that includes previous senior technology leadership roles at Sabre and Travelocity. Ms. Godbole serves on the IBM Advisory Board, Apparo's CXO Tech Council and the Foundation for the Carolinas as a member of the Board of Advisors for the Charlotte Mecklenburg Community Foundation. Ms. Godbole holds a Bachelor of Engineering degree in Electrical and Electronics Engineering from the National Institute of Technology in Nagpur, India and an M.S. degree in Computer Science from Texas Tech University. Ms. Godbole brings to Kenvue's Board of Directors significant insights into global e-commerce, digital transformation, cybersecurity and technology strategies and has proven expertise in growing digital businesses through technology-enabled innovations.

**Defendant Healey**

39.     Defendant Healey has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant serves as the Chair of the Nominating, Governance & Sustainability Committee. According to the Prospectus, as of August 25, 2023, Defendant Healey beneficially owns 7,771 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Healey owns approximately $178,499.87 worth of Company stock.

40.     The Prospectus states the following about Defendant Healy:

*Melanie L. Healey* has served as a Director of Kenvue since May 2023. Ms. Healey served as a Group President of The Procter & Gamble Company from 2007 to 2015. In her 25 years at Procter & Gamble, she held several senior leadership positions, including Group President and Advisor to the Chairman and Chief Executive Officer, Group President of the North America Region, and Group President of the Global Health Care, Feminine Care and Adult Care Sector. Ms. Healey has more than 30 years of experience at multinational consumer goods companies, including Procter & Gamble, Johnson & Johnson and S.C. Johnson & Sons, and nearly two decades of experience outside the United States. She currently serves as a board member for Hilton Worldwide Holdings Inc., PPG Industries, Inc. and Verizon Communications Inc. She served as a board member for Target Corporation from 2015 to 2023. Ms. Healey holds a B.S. degree in Business Administration from the University of Richmond. Ms. Healey brings to Kenvue's Board of Directors extensive experience in the consumer goods industry, valuable strategic insights,

including with respect to trends in brand building, marketing, distribution and international operations, and significant corporate governance expertise, including through her service as a director for several large public companies.

**Defendant Holden**

41.     Defendant Holden has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Holden serves as the Chair of the Compensation Committee. According to the Prospectus, as of August 25, 2023, Defendant Holden beneficially owns 7,620 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Holden owns approximately $175,031.40 worth of Company stock.

42.     The Prospectus states the following about Holden:

Betsy D. Holden has served as a Director of Kenvue since May 2023. Ms. Holden served as a Senior Advisor to McKinsey & Company from 2007 to 2020. She previously held several leadership roles at Kraft Foods, including Co-Chief Executive Officer of Kraft Foods Inc., President, Global Marketing and Category Development of Kraft Foods Inc. and President and Chief Executive Officer of Kraft Foods North America. Ms. Holden has served on nine public boards over the last 20 years, including Diageo Plc (2009 to 2018) and Time, Inc. (2014 to 2018). She currently serves as a board member for Dentsply Sirona Inc., National Retail Properties, Inc., Western Union Company and several private portfolio companies of Paine Schwartz Partners, a private equity firm focused on sustainable agriculture and food products for which she sits on the Food Chain Advisory Board. She also serves on the Executive Committee of Duke University's Board of Trustees and the Global Advisory Board of Northwestern University's Kellogg School of Management. Ms. Holden holds a B.A. degree in Education from Duke University as well as an M.A. degree in Teaching and an MBA degree, each from Northwestern University. Ms. Holden brings to Kenvue's Board of Directors a deep understanding of executive leadership, human capital management and corporate governance, including through her experiences as a chief executive officer, director and advisor for large public companies, complemented by an extensive knowledge of international business and strategy, including with respect to marketing, sales and digital development.

**Defendant Merlo**

43.     Defendant Merlo has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Merlo serves on the Executive Committee and as the Chair of the Board. According to the Prospectus, as of August 25, 2023, Defendant Merlo beneficially owns 11,854 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Merlo owns approximately $272,286.38 worth of Company stock.

44.     The Company's website states the following about Defendant Merlo:

*Larry Merlo* has served as Chair of Kenvue since May 2023. Mr. Merlo served as President and CEO of CVS Health from 2011 to 2021. Mr. Merlo previously held positions of increasing responsibility over his more than 40 years at CVS Health and its subsidiaries, including Chief Operating Officer of CVS Health, President of CVS Pharmacy and Executive Vice President–Stores. Mr. Merlo previously served as a board member for CVS Health, America's Health Insurance Plans (AHIP), National Association of Chain Drug Stores (NACDS), the Partnership for Rhode Island and Business Roundtable. He currently serves on the University of Pittsburgh Board of Trustees, where he is Chair of the Budget Committee, a member of the Compensation Committee and formerly chaired the Research & Innovation Committee. He also serves as an advisor to Korn Ferry and Charlesbank Capital Partners. Mr. Merlo holds a B.S. degree from the University of Pittsburgh School of Pharmacy. Mr. Merlo brings to Kenvue's Board of Directors significant experience as a chief executive officer, director and advisor, with an in-depth knowledge of health and consumer trends, including in the areas of digital development, marketing, sales, science and technology.

**Defendant Prabhu**

45.     Defendant Prabhu has served as a Company director since the closing of the Company's IPO on May 8, 2023. As a member of the Board, Defendant Prabhu serves as Chair of the Audit Committee. According to the Prospectus, as of August 25, 2023, Defendant Prabhu beneficially owns 7,620 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Prabhu owns approximately $175,031.40 worth of Company stock.

46.     The Company's website states the following about Defendant Prabhu:

*Vasant Prabhu* has served as a Director of Kenvue since May 2023. Mr. Prabhu has served as Vice Chairman of Visa Inc. since 2019 and served as Chief Financial Officer from 2015 to 2023. He previously served as Chief Financial Officer for NBCUniversal Media, LLC, Chief Financial Officer and Vice Chairman of Starwood Hotels and Resorts Worldwide, Inc. and Executive Vice President and Chief Financial Officer of Safeway, Inc. He has also held senior leadership roles at The McGraw-Hill Companies, Inc., PepsiCo, Inc. and Booz Allen Hamilton. Mr. Prabhu currently serves as a board member for Delta Air Lines, Inc., and he served as a board member for Mattel, Inc. from 2007 to 2020, where he was Chair of the Audit Committee. Mr. Prabhu holds a Bachelor of Technology degree in Mechanical Engineering from the Indian Institute of Technology and an MBA degree from the University of Chicago. Mr. Prabhu brings to Kenvue's Board of Directors vast experience as a chief financial officer of a number of large public companies and a sophisticated understanding of complex accounting principles and judgments, financial results, internal controls and financial reporting rules, regulations, processes and investor relations.

## **Defendant Sneed**

47.     Defendant Sneed has served as a Company director since the closing of its IPO on May 8, 2023. According to the Prospectus, as of August 25, 2023, Defendant Sneed beneficially owns 18,407 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Sneed owns approximately $422,808.79 worth of Company stock.

48.     The Prospectus states the following about Defendant Sneed:

*Michael E. Sneed* has served as a Director of Kenvue since May 2023. Mr. Sneed served as Executive Vice President, Global Corporate Affairs and Chief Communication Officer of Johnson & Johnson from 2018 to 2022. He also served as a member of Johnson & Johnson's Executive Committee during that time. Mr. Sneed originally joined Johnson & Johnson in 1983 and previously held a variety of senior leadership roles, including Vice President, Global Corporate Affairs and Chief Communications Officer, Company Group Chairman, Vision Care Franchise and Company Group Chairman, Consumer North America. He currently serves as a board member for Wayfair Inc. He also serves on the boards of Thomas Jefferson University, the Robert Wood Johnson Foundation and WHYY, a public media organization serving Philadelphia, Pennsylvania and the surrounding region. Mr. Sneed holds a B.A. degree in Economics and Psychology from Macalester College and an MBA degree from the Tuck School of Business at Dartmouth College. Mr. Sneed brings to Kenvue's Board of Directors a deep understanding of the Consumer Health Business through his senior leadership positions at Johnson & Johnson as

well as extensive strategic and operational expertise leading global marketing, communication, design and philanthropy functions.

**Defendant Wolk**

49.     Defendant Wolk has served as a Company director since the closing of its IPO on May 8, 2023. Additionally, Defendant Wolk has served as Executive Vice President, Chief Financial Office of Johnson & Johnson and as a member of its Executive Committee since 2018. According to the Prospectus, as of August 25, 2023, Defendant Wolk beneficially owns 8,158 shares of Kenvue common stock. Given that the price per share of the Company's stock at the closing of trade on August 25, 2023, was $22.97, Defendant Wolk owns approximately $187,389.26 worth of Company stock.

50.     The Prospectus states the following about Defendant Wolk:

*Joseph J. Wolk* has served as a Director of Kenvue since May 2023. Mr. Wolk has served as Executive Vice President, Chief Financial Officer of Johnson & Johnson since 2018. He also serves as a member of Johnson & Johnson's Executive Committee. Mr. Wolk previously held a variety of senior leadership roles in several sectors and functions during his 24 years at Johnson & Johnson, including Vice President of Investor Relations, Vice President of Finance for the Pharmaceuticals Group, Vice President of Finance for the Medical Devices Global Supply Chain and Chief Financial Officer of the North America Pharmaceuticals Group. He is also the executive sponsor of Johnson & Johnson's Impact Venture Fund and Veterans Leadership Council and champions Johnson & Johnson's Finance Leadership Development Program. He serves on the St. Joseph's University Board of Trustees and is a member of the Stanford Medicine Board of Fellows, the CNBC Global CFO Council and the Wall Street Journal CFO Network. Mr. Wolk holds a B.S. degree in Finance from St. Joseph's University and a J.D. degree from Temple University School of Law. Mr. Wolk brings to Kenvue's Board of Directors a deep understanding of the Consumer Health Business through his senior leadership positions at Johnson & Johnson, broad expertise in management, strategy, finance and operations, substantial experience in the healthcare industry and a strong commitment to business innovation, talent development and purpose-based leadership.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51. By reason of their positions as officers, directors, and/or fiduciaries of Kenvue and because of their ability to control the business and corporate affairs of Kenvue, the Individual Defendants owed Kenvue and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Kenvue in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Kenvue and its shareholders so as to benefit all shareholders equally.

52. Each director and officer of the Company owes to Kenvue and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Kenvue, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54. To discharge their duties, the officers and directors of Kenvue were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Kenvue, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Kenvue's Board at all relevant times.

56.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57.     To discharge their duties, the officers and directors of Kenvue were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Kenvue were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Kenvue's own Code of Conduct;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Kenvue conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Kenvue and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Kenvue's operations would comply with all applicable laws and Kenvue's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.     Each of the Individual Defendants further owed to Kenvue and the shareholders the duty of loyalty requiring that each favor Kenvue's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Kenvue and were at all times acting within the course and scope of such agency.

60.     Because of their advisory, executive, managerial, directorial, and controlling positions with Kenvue, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Kenvue.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

62.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Kenvue was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Kenvue and was at all times acting within the course and scope of such agency.

## KENVUE'S CODE OF CONDUCT

67.     Kenvue's Code of Conduct "sets forth those values, principles, and policies to which we commit ourselves every day." The Code of Conduct "applies to all Kenvuers regardless of where we work or the type of work we do, providing clear expectations and behaviors."

68.    In a section titled "Finance & Tax Records," the Code of Conduct states the

following:

> Our financial records provide valuable information in support of our business
> decisions and actions and allow us to comply with legal and regulatory obligations,
> as well as meet shareholder expectations.
>
> The accuracy of financial records is essential to operating an honest, trustworthy
> and transparent business. Therefore, we have a duty to keep truthful, complete and
> timely financial and tax records that represent the accurate condition and results of
> the company.
>
> Kenvue operates robust internal controls to preserve our financial integrity and
> ensure compliance with applicable financial and tax laws and regulations of each
> jurisdiction in which we operate. Certain finance leaders complete quarterly and
> annual attestations for financial reporting and internal controls in line with company
> policy and the SOX Program Management Office.

69.    In a section titled "Fair Competition & Antitrust Laws," the Code of Conduct states

the following:

> We treat our competitors and customers as we would like to be treated: with honesty
> and integrity and supporting a free market. Antitrust and fair competition laws
> protect consumers from unfair business practices, thus maintaining fair prices and
> freedom of choice.
>
> We do not take unfair advantage of any customer, supplier, competitor or others
> through inequitable practices, including manipulation, concealment, collusion or
> misrepresentation of material facts.

70.    In a section titled "Important Role as a People Leader," the Code of Conduct states

the following, in relevant part:

> • Act as a role model, demonstrating and promoting ethical conduct.
> • Encourage Kenvuers to speak up without retaliation.
> • Promptly manage concerns and issues shared with you and partner with Employee
> Relations/Labor Relations (ER/LR) to escalate as necessary.
> • Act in accordance with corrective or preventive action when someone violates the
> Code of Conduct.
> • Fully support any company investigation.

71.    In a section titled "Reporting Concerns," the Code of Conduct states the following:

We all have an obligation to report concerns should we become aware of a known or suspected violation of the law or company policy. Potential violations may be reported to your manager, ER/LR, BUHR, the Legal & Compliance Department, Security, and/or Global Audit & Assurance. Additionally, the Kenvue Integrity Line (KenvueIntegrityLine.com) is available for anyone to ask a question or report a concern by phone or online. It is run by an independent third party and is available 24 hours a day, 7 days a week in multiple languages. Individuals contacting the Integrity Line may remain anonymous.

When reporting information, Kenvuers should provide specific details so that the issue can be addressed thoroughly and promptly. The company will ensure a fair investigation process while respecting the principles of confidentiality. Any investigation will also comply with applicable local legislation and due process. During an investigation, the full cooperation of everyone involved is mandatory. This includes providing relevant information in a timely and complete manner and not discussing the investigation with potential witnesses or doing anything else that could interfere with the integrity or confidentiality of the process.

The company does not tolerate retaliation against anyone who raises a concern under this Code or assists with an investigation. Any Kenvuer who engages in retaliation, or violates the principles and requirements set forth in this Code of Conduct, will face disciplinary action up to and including termination of employment.

72.     In a section titled "Insider Trading," the Code of Conduct states the following:

During the course of working for Kenvue, you may find out important information about the Company before it is released to the public. You are responsible for maintaining the confidentiality of non-public Company information. If you have important information that has not been disclosed to the public, you are not allowed to:
- Buy or sell Kenvue stock or "put" or "call" options on Kenvue stock;
- Make transfers or adjustments to other investment vehicles, including retirement funds;
- Disclose non-public information to family, friends or any other person outside the Company;
- Recommend to family, friends or others that they buy or sell Kenvue stock or "put" or "call" options on Kenvue stock.

Complying with securities laws extends beyond our Company. You may not buy or sell securities of any other company using material non-public information you may have learned about those companies. Questions, concerns, or suspected violations related to Insider Trading may be directed to the Legal & Compliance Department, The People Function lead, and/or the Kenvue Integrity Line.

73.     In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> The way we conduct ourselves in our business dealings impacts the trust we maintain with stakeholders. By taking proactive steps to prevent conflicts of interest, we send a clear message about the integrity of the Company and our determination to do what's right.
>
> All Kenvuers are expected to make business decisions based on the best interest of our Company and not for personal gain or benefit. Kenvuers are required to proactively and promptly disclose actual or perceived conflicts of interest to their manager or a member of the The People Function, Legal & Compliance Departments.

74.     In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment.  Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## CODE OF BUSINESS CONDUCT & ETHICS FOR MEMBERS OF THE BOARD OF DIRECTORS AND EXECUTIVE OFFICERS

75.     The Company also maintains a Code of Business Conduct & Ethics specifically for Board members and executives. The Code of Business Conduct & Ethics charges Board members with "promptly reporting" any prohibited acts under the code to the appropriate authority.

76.     In a section labeled "Conflicts of Interests," the Code of Business Conduct & Ethics states:

> Every Director and Executive Officer has a duty to avoid business, financial or other direct or indirect interests or relationships which conflict with the interests of the Company or which divide his or her loyalty to the Company. A conflict or the

appearance of a conflict of interest may arise in many ways. Each Director and Executive Officer must deal at arm's length with the Company and should disclose to the Chair or Lead Director (if any) any conflict or any appearance of a conflict of interest on his or her part. Any activity which even appears to present such a conflict must be avoided or terminated unless, after such disclosure to the Board, it is determined that the activity is not harmful to the Company or otherwise improper. The end result of the process of disclosure, discussion and consultation may well be approval of certain relationships or transactions on the ground that, despite appearances, they are not harmful to the Company. But all conflicts and appearances of conflicts of interest are prohibited, even if they do not harm the Company, unless they have gone through this process.

77.     In a section labeled "Compliance with Laws and Regulations," the Code of

Business Conduct & Ethics states:

Consistent with our business philosophy, it is the policy of Kenvue to comply with the laws of each country in which our companies do business. Each Director and Executive Officer shall comply with all applicable laws, rules and regulations, and shall use all reasonable efforts to oversee compliance by employees, other Directors and other Executive Officers with all applicable laws, rules and regulations.

## AUDIT COMMITTEE CHARTER

78.     The Company also maintains an Audit Committee Charter. The Charter explains

that "the purpose of the Committee shall be to provide oversight of the financial management,

independent auditor and financial reporting procedures of the Company and assist the Board with

respect to designated risk oversight matters, as well as such other matters as directed by the Board

or this Charter."

79.     Under a section titled "Duties and Responsibilities," the Audit Committee Charter

states the following, in relevant part:

The Company's management is responsible for preparing the Company's financial statements and the independent auditors are responsible for auditing these financial statements. The Committee is responsible for overseeing the conduct of these activities by the Company's management and the independent auditors, and the integrity of the Company's financial statements. The financial management and the independent auditors of the Company have more time, knowledge and more detailed information on the Company than do Committee members. Consequently, in carrying out its oversight responsibilities, the Committee is not providing any

expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditors' work. The Committee is also responsible for preparing the Report of the Audit Committee that SEC rules require be included in the Company's annual Proxy Statement.

80.     Under a section titled "Audited Financial Statements," the Audit Committee

Charter states that the Audit Committee is responsible for the following:

The Committee shall discuss with management and the independent auditors the audited financial statements to be included in the Company's Annual Report on Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and review and consider with the independent auditors the matters required to be discussed by the applicable Auditing Standards issued by the PCAOB (the "Auditing Standards"). Based on these discussions, the Committee will advise the Board whether it recommends that the audited financial statements be included in the Annual Report on Form 10-K.

81.     Under a section titled "Assist the Board in Oversight of the Company's Financial

Reporting Compliance and Practices," the Audit Committee Charter states that the Audit

Committee is tasked with reviewing and monitoring:

a. Litigation or other legal matters that could have a significant impact on the Company's financial results.

b. Significant findings of any examination by regulatory authorities or agencies, in the areas of securities, accounting or tax, such as the SEC or the U.S. Internal Revenue Service.

c. The Company's disclosure controls and procedures.

d. The impacts of any new rules, standards, or regulatory guidance that pertain to accounting, auditing, and/or financial reporting, including but not limited to discussions, as needed, with the independent auditors, management, and external advisors with respect to the Company's implementation progress regarding any such new rules, standards, or regulatory guidance.

82.     In violation of the Audit Committee Charter, Defendants Allison, Franklin,

Godbole, and Prabhu failed to adequately review and discuss the Company's quarterly earnings

press releases; failed to adequately exercise their risk management and risk assessment functions;

and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background and IPO*

83.     On November 12, 2021, J&J announced it was spinning off its consumer health division into a separate company because of conflicts of interest between J&J's health offerings compared to those in the consumer health division. The announcement, published on J&J's website, was titled "Johnson & Johnson Announces Plans to Accelerate Innovation, Serve Patients and Consumers, and Unlock Value through Intent to Separate Consumer Health Business." J&J further announced that the spinoff company would "be a leading global consumer health company, touching the lives of over one billion consumers around the world every day through iconic brands such as Neutrogena, AVEENO®, Tylenol®, Listerine®, JOHNSON's®, and BAND-AID® and continuing its legacy of innovation." Because Kenvue inherited several of J&J's household name brands, consumers and the investing public were already familiar with many of Kenvue's products, and as such, relied on prior statements made by J&J regarding the safety and efficacy of those products.

84.     On May 4, 2023, Kenvue held its IPO and issued 1.89 billion shares, of which approximately 170 million were offered at the IPO. After the IPO, J&J retained about 89.6% of Kenvue's shares and was deemed a controlling shareholder under SEC regulations.

85.     On August 23, 2023, Kenvue and J&J completed a spin-off transaction where Kenvue exchanged J&J 190,955,436 shares for 1,533,830,450 shares of Kenvue common stock. Following this transaction, J&J's interest in Kenvue was reduced to approximately 9.5% of Kenvue's outstanding shares.

*PE Ingredients in Kenvue's Products and the FDA' Findings*

86.     Today, Kenvue describes itself as "the world's largest pure-play consumer health company by revenue and hold a unique position at the intersection of healthcare and consumer goods."

87.     A significant portion of Kenvue's business involves over-the-counter medicine products that contain the ingredient PE.  PE is a common ingredient in decongestant medicines such as Tylenol Sinus + Headache Non-Drowsy Daytime Caplets, Sudafed, and Benadryl Allergy Plus, among others. PE became increasingly popular following the Combat Methamphetamine Epidemic Act of 2005, which restricted sales of medicines containing pseudoephedrine—a commonly used ingredient in illegal methamphetamine production.

88.     On September 12, 2023, the Food and Drug Administration ("FDA") published its findings regarding the use of PE as a nasal decongestant (the "Findings"). In its publication, the FDA stated that it convened an advisory committee to "discuss the adequacy of efficacy data available for orally administered [PE] as a nasal decongestant and where the oral nasal decongestants phenylephrine hydrochloride and phenylphrine bitartrate should be reclassified as Generally Recognized as Safe and Effective (GRASE) due to lack of efficacy."

89.     The effectiveness of over-the-counter drugs is defined in 21 CFR § 330.10(a)(4)(ii) as "a reasonable expectation that, in a significant proportion of the target population, the pharmacological effect of the drug, when used under adequate directions for use and warnings against unsafe use, will provide clinically significant relief of the type claims."

90.     The FDA concluded that following a "thorough review of all those data" related to the efficacy of oral PE as a nasal decongestant, it would no longer label products containing PE as

GRASE. While there were no safety issues found with the use of oral PE as a decongestant, the FDA panel unanimously found that there were also no benefits.

91.     Throughout the Relevant Period, the Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Kenvue's business, operations, and prospects. In particular, Defendants failed to disclose to shareholders and investors that: (1) the Company faces potential headwinds because of the FDA's concerns about PE's ineffectiveness; (2) the Company did not discuss or disclose the risks related to the efficacy of PE in its IPO, even though questions regarding its efficacy have been prevalent since 2007; (3) the Company failed to disclose specific risks relating to potential litigation stemming from adverse findings on PE; (4) the Company failed to maintain internal controls; and (5) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Statements**

92.     On January 4, 2023, Kenvue filed with the SEC the Registration Statement on Form S-1. In combination with subsequent amendments on Form S-1/A (the "Amended Registration Statement") and filed pursuant to Rule 424(b)(4), the Amended Registration Statement was used for the Company's IPO.

93.     On May 3, 2023, Kenvue filed with the SEC its final prospectus for the IPO on Form 424B4 (the "IPO Prospectus"), which forms part of the Amended Registration Statement. On May 4, 2023, Kenvue held its IPO and issued 1.89 billion shares, of which approximately 170 million were sold to the public. Accordingly, J&J retained about 89.6% of the shares following the IPO and was deemed a controlling shareholder under SEC regulation.

94.     The Amended Registration Statement, however, was negligently prepared and contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

95.     Under applicable SEC rules and regulations, the Amended Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

96.     In the risk disclosures section of the Amended Registration Statement, the Company noted that "concerns about the reliability, safety or efficacy of our products or their ingredients could result in litigation, regulatory action, reputational damage, product recalls, product reformulations or product withdrawals, which could adversely affect our business, results of operations or financial conditions."

97.     In full, the Company stated:

Concerns about the reliability, safety or efficacy of our products or their ingredients, whether raised internally or by litigants, regulators, consumer advocacy groups, third-party interest groups or others, and whether or not based on scientific or factual evidence, have resulted, and could in the future result, in governmental investigations, regulatory action (including the shutdown of manufacturing facilities), private claims and lawsuits, significant remediation and related costs, safety alerts, product shortages, declining sales or reputational damage (including damage to brand image, brand equity and consumer trust in our products). We have in the past paid, and we may be required in the future to pay, for losses or injuries purportedly caused by our products. These claims may be based on a variety of allegations, including that our products contain contaminants or impurities, provide inadequate instructions or warnings regarding their use, have defective packaging, fail to perform as advertised or damage property or persons. If any of our products, or an ingredient contained in any of our products, is perceived or found to be contaminated or tampered with, or otherwise defective or unsafe, we have needed to, and may in the future need to, recall, reformulate or withdraw our products, which could result in the adverse effects described above. The availability of third-party product liability insurance is uncertain and, even if available, potential claims may be subject to a deductible, exceed the amount of coverage or be excluded under the terms of the policies. See "—Risks Related to

Our Operations—Insurance coverage, even where available, may not be sufficient to cover losses we may incur."

Product recalls, product reformulations and product withdrawals of various magnitudes have occurred in each of our business segments and may occur in the future, including as a result of manufacturing issues, contamination issues, shipping and other supply chain issues and labeling issues. For example, with respect to our Skin Health and Beauty segment, in July 2021, Johnson & Johnson Consumer Inc. ("Old JJCI") voluntarily recalled all lots of five Neutrogena and Aveeno aerosol sunscreen product lines to the consumer level and advised consumers to stop using the affected products out of an abundance of caution after internal testing identified low levels of benzene in some samples of the products, though based on exposure modeling and the U.S. Environmental Protection Agency's framework, daily exposure to benzene in the recalled products would not be expected to cause adverse health consequences. See Note 13, "Commitments and Contingencies," to our audited combined financial statements included elsewhere in this prospectus for additional information regarding benzene.

We have also faced, and could face in the future, concerns about the reliability, safety or efficacy of the ingredients used in our products. Scrutiny of ingredients we use in our products, including scrutiny that originates on digital or social media platforms, may result in an inability to use, or restrictions on the use of, the ingredients or a requirement for remedial action, which could cause us to incur significant additional costs, particularly if we need or otherwise decide to reformulate the affected products, or result in litigation. For example, Johnson & Johnson Inc. (Canadian affiliate) ("JJI") previously sold over-the-counter Zantac (ranitidine) products in Canada. JJI has been named as a defendant, along with other manufacturers, in four proposed class actions in Canada alleging that Zantac and other over-the-counter medications that contain ranitidine may degrade and result in unsafe levels of NDMA (N-nitrosodimethylamine) and can cause or have caused various cancers in patients using the products. JJI has also been named as a defendant, along with other manufacturers, in various personal injury actions in Canada related to Zantac products. Though we may have rights to indemnification from third parties for certain liabilities relating to these claims, it is not possible, at this stage, to assess reliably the outcome of these lawsuits or the potential financial impact on the Company. Johnson & Johnson has also received demands for indemnification for legal claims related to over-the-counter Zantac products sold by third parties in the United States. In addition, Johnson & Johnson Consumer Inc. and other subsidiaries of Johnson & Johnson have been named in cases alleging that prenatal exposure to Tylenol, an acetaminophen product, is associated with the development of autism spectrum disorder and attention-deficit/hyperactivity disorder in children. Plaintiffs have asserted similar claims against retailer chains, alleging similar injuries resulting from use of store-brand generic acetaminophen products. In September 2022, the Judicial Panel on Multidistrict Litigation ("MDL") consolidated all such cases pending in the U.S. federal courts. At this time, the MDL proceedings are in their early stages. It is not possible at this stage

to assess reliably the outcome of these cases or the potential financial impact on the Company. See Note 13, "Commitments and Contingencies," to our audited combined financial statements included elsewhere in this prospectus and Note 11, "Commitments and Contingencies," to our unaudited condensed combined financial statements included elsewhere in this prospectus for additional information regarding litigation related to Zantac and acetaminophen.

If we remove certain ingredients from our products, either voluntarily or pursuant to a regulatory mandate, we may not be able to successfully develop an alternative formulation or obtain necessary regulatory approvals on a timely basis, or at all. Furthermore, any reformulated product we introduce to the market may not be positively received by consumers and customers, which could result in lost sales, damage our reputation or our brands or otherwise adversely affect our business, results of operations or financial condition.

Moreover, negative perceptions of our products or their ingredients may arise from product liability claims, product recalls or product withdrawals, regardless of whether the claims, recalls or withdrawals directly involve us or our products. In addition, the mere publication of information asserting concerns about the reliability, safety or efficacy of competing products or ingredients in competing products that are also used in our products could adversely affect our business, results of operations or financial condition. Increased regulation, litigation or adverse publicity concerning ingredients used in our products, such as acetaminophen, may discourage consumers from buying our products that contain those ingredients, even when the regulation, litigation or publicity does not directly relate to or expressly mention us or our products, and even if not accurate. ***In addition, we believe our products are reliable, safe and effective when used for their intended purposes in accordance with label directions.*** However, consumers have misused, and may in the future misuse, our products, including for unauthorized, nefarious or other unintended purposes, which in certain instances has had, and may in the future have, serious or even fatal implications. Misuse of our products has led to, and may in the future lead to, criticism on digital and social media platforms, negative coverage by traditional media and other forms of adverse publicity regarding our products or their ingredients, which could similarly discourage consumers from buying our products or otherwise adversely affect our reputation or our brands. See "—Risks Related to Our Business and Industry—Our brands are critical to our success, and damage to our reputation or our brands could adversely affect our business, results of operations or financial condition."

(Emphasis added).

98.     The above statement was materially false and misleading because it did not detail

effectiveness issues with products containing PE, which could ultimately lead to Company

products which contain PE being taken off of store shelves. Efficacy issues with PE was already an ongoing issue which the Company failed to disclose.

99.    Indeed, the Company touted the strength of its brands and the efficacy supporting those over-the-counter drugs yet failed to mention any material risks linked to the FDA questioning PE, which has been questioned since 2007. In fact, the IPO Prospectus emphasized Tylenol products containing PE, stating:

> Tylenol is the #1 global Pain brand and the #2 global Self Care brand, with the #1 U.S. household penetration. Tylenol has been caring for families since 1955 when its first product, Children's Elixir, was launched. Although the Tylenol story started with just one product, it has evolved to include a full suite of pain relief, cold and flu, sleep and pediatric products. ***Studies sponsored by Johnson & Johnson Consumer Inc. and by third parties have shown that these products help relieve, among other things***, headache and muscle pain, arthritis pain, ***sinus and nasal congestion***, fever and pain with sleeplessness. Kenvue is continuously looking for ways to expand Tylenol's brand leadership, particularly through Kenvue's digital and connected health offerings. For example, in 2022 Kenvue launched the Tylenol SmartCheck Digital Ear Scope, which empowers consumers to work with their healthcare providers to check for ear infections remotely, avoiding costly and time-consuming in-person visits.

(Emphasis added.)

100.    This statement was materially false and misleading because it emphasized that these products were useful in relieving nasal congestion, even though the efficacy of such drugs had been questioned since at least 2007.

101.    On June 2, 2023, the Company filed with the SEC on Form 10-Q its quarterly report for the quarterly period ended April 2, 2023 (the "Q1 10-Q"). The Q1 10-Q noted that any "Risk Factors" had been detailed in the final IPO Prospectus. The Company, therefore, decided to provide the same Risk Factors without any updates, even as it acknowledges that it "may disclose changes to such factors or disclose additional factors from time to time in our future filings with the SEC."

102.    The Q1 10-Q was materially false and misleading for the same reasons that the Amended Registration Statement's risk factors were materially false and misleading as stated in ¶ 97.

103.    On August 2, 2023, the Company filed with the SEC on Form 10-Q its quarterly report for the period ended July 2, 2023 (the "Q2 10-Q"). The Q2 10-Q provided the same risk factors as stated in the Q1 10-Q and the Amended Registration Statement.

104.    Accordingly, the Q2 10-Q was false and misleading for the same reasons as the Q1 10-Q and the Amended Registration Statement as stated in ¶ 97.

105.    Thus, the statements identified in ¶¶ 92, 96-97, 99, 101, and 103 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results. Specifically, the Registration Statement contained false and/or misleading statements and/or failed to disclose that: (1) the Company faces potential headwinds because of the FDA's concerns about PE's ineffectiveness; (2) the Company did not discuss or disclose the risks related to the efficacy of PE in its IPO, even though questions regarding its efficacy have been prevalent since 2007; (3) the Company failed to disclose specific risks relating to potential litigation stemming adverse findings regarding PE; (4) the Company failed to maintain internal controls; and (5) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

106.    On September 12, 2023, the FDA published its Findings regarding the efficacy of PE. In it, the FDA stated that it had convened an advisory committee dedicated to discussing "the

adequacy of efficacy data available for orally administered phenylephrine as a nasal decongestant and whether the oral nasal decongestants phenylephrine hydrochloride and phenylephrine bitartrate should be reclassified as not Generally Recognized as Safe and Effective (GRASE) due to lack of efficacy."

107.    Effectiveness is defined under 21 CFR § 330.10(a)(4)(ii) as "a reasonable expectation that, in a significant proportion of the target population, the pharmacological effect of the drug, when used under adequate directions for use and warnings against unsafe use, will provide clinically significant relief of the type claims."

108.    The implications of having a GRASE designation revoked are substantial. This potentially meant that drugs containing PE would at the very least now need labels declaring their questionable efficacy, and at worst, be taken off the shelves.

109.    The FDA disclosed that it had been evaluating data on the efficacy of oral PE since December 2007 because of two citizen petitions; one petition was filed in December 2007 and another in late 2015. The petitioners were researchers from the University of Florida who argued the following about PE:

- PE is no more effective than a placebo in decreasing nasal congestion.
- Additional plasma concentration data from published pharmacokinetic studies are consistent with a lack of efficacy due to PE having low oral bioavailability.
- Lack of clinically important adverse effects on blood pressure at the doses evaluated in these pharmacokinetic studies are consistent with a lack of efficacy.
- Because *in vitro* data show the nasal vasculature in man and the pig are less sensitive to PE than the extranasal vasculature, there is no pharmacological basis for oral PE to alleviate symptoms of nasal congestion without attendant peripheral side effects.

110.    In the Findings, the FDA stated that since 2007 it had "continued to re-evaluate the scientific support for use of oral PE as a nasal decongestant" and that it had "now completed a

thorough review of all those data." The review was based on "significant new data" that was not available when the original GRASE decision was made.

111.    While the FDA acknowledged the potential harm to the industry by relabeling products that contain PE to no longer be GRASE, the Agency noted why it needed to no longer label PE products as GRASE, stating:

> [Benefits] are not limited to avoiding the unnecessary costs and delay in care of taking a drug that has no benefit, avoiding the risks of potential allergic reactions or other side effects related to use of phenylephrine in combination products, avoiding the inherent risks (especially for combination therapies) of taking more in order to seek some benefit, avoiding the risks of medication use in children, lowering of overall healthcare costs, and avoiding missed opportunities for use of more effective treatments (including seeing a doctor if needed).

112.    Thus, in a unanimous decision the FDA panel declared that while PE use presents no safety issues, "*orally administered PE is not effective as a nasal decongestant [. . .]*" (Emphasis added).

113.    On the news of the FDA panel's decision, Kenvue stock fell from a closing price of $22.07 per share on September 11, 2023 to a closing price of $21.06 per share on September 12, 2023. This represented a decline of $1.01 per share, or 4.58%.

**<u>Subsequent Developments</u>**

114.    At the time of filing this Complaint, Kenvue has provided limited disclosures related to the FDA panel's decision. Yet, the Company continues to market and tout the purported decongestant effects of PE.

115.    For example, the Company still advertises its Sudafed PE Sinus Congestion product as providing "maximum-strength sinus pressure *and nasal congestion relief*." In a footnote, the Company notes that "The Nonprescription Drugs Advisory Committee of the Food and Drug

Administration reviewed efficacy data available for orally administered [PE] as a nasal decongestant. Read the FDA's statement about this review here."



116.    Similarly, the Company advertises its "TYLENOL® Sinus + Headache Non-Drowsy Daytime Caplets" as "deliver[ing] fast relief for sinus headaches and sinus pain." In a footnote, it provides the same, limited disclosure as noted in ¶ 115.



117.    In yet another example, the Company continues to advertise its "Benadryl Allergy Plus Congestion" product as providing "effective relief from symptoms including [. . .] congestion [. . .]."



118.    The Defendants violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties that the Company was experiencing. The Defendants were required to incorporate into the registration statement all "known trends or uncertainties"[1] that were reasonably expected to have a material impact on the Company's operations.

119.    Additionally, Defendants were required in the "Risk Factor" section of the Amended Registration Statement to detail the most significant factors that made their IPO either risky or speculative and to adequately describe the risk.[2] Here, the Defendants failed to disclose an on-going significant problem that underlined the base of its business, predominantly the FDA's

---

[1] Item 303 of SEC Reg. S-K 17 C.F.R. § 229.303(a)(3)(ii).
[2] SEC Regulation S-K, 17 C.F.R. § 229.503.

reclassification of Kenvue's prominent active decongestant ingredient PE. Moreover, the Defendants failed to discuss the impact that these risks would have on the Company's share price. Accordingly, the Defendants describing known and ongoing risks as "may" occur or "could" adversely affect the Company are false and misleading.

## DAMAGES TO KENVUE

120.    As a direct and proximate result of the Individual Defendants' misconduct, Kenvue has lost and will continue to lose and expend many millions of dollars.

121.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

124.    As a direct and proximate result of the Individual Defendants' conduct, Kenvue has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

125.   Plaintiff brings this action derivatively and for the benefit of Kenvue to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Kenvue, gross mismanagement, abuse of control, waste of corporate assets, and the aiding and abetting thereof.

126.   Kenvue is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127.   Plaintiff is, and has been at all relevant times, a shareholder of Kenvue. Plaintiff will adequately and fairly represent the interests of Kenvue in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

128.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

129.   A pre-suit demand on the Board of Kenvue is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eleven individuals: Defendants Mongon, Allison, Fasolo, Franklin, Godbole, Healey, Holden, Merlo, Prabhu, Sneed, and Wolk. Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time of the filing of this complaint.

130.   Demand is excused as to all of the Director Defendants because each one of them received their position as a director from the false and misleading Amended Registration Statement.  Therefore, they are unable to impartially investigate the charges against them as they have materially benefitted from Defendant J&J's and their own continued wrongdoing. Thus, demand upon the Director Defendants is futile and excused.

131.    Demand is further excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants again unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133.    Additional reasons that demand on Defendant Mongon is futile follow. Defendant Mongon is the CEO of Kenvue and has served as a Company director since the IPO closed on May 8, 2023. Kenvue provides Defendant Mongon with his principal occupation and substantial compensation. Thus, as the Company admits, Defendant Mongon is a non-independent director. As a member of the Board, Defendant Mongon serves on the Executive Committee. As the trusted leader of the Company, Defendant Mongon conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, prior to becoming CEO of Kenvue, Defendant Mongon served as the EVP and Worldwide Chairman, Consumer Health at J&J

meaning he was and is intimately familiar with Kenvue's offerings, including of some of their largest brands such as Tylenol. As such, he had specialized knowledge and awareness about the FDA's investigation into whether one of Kenvue's key, active ingredients PE was actually effective. For these reasons, Defendant Mongon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Allison is futile follow. Defendant Allison has served as a member of the Board since the closing of the IPO on May 8, 2023. Additionally, he receives handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Allison breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Fasolo follow. Defendant Fasolo has served as a Company Director since the closing of the IPO on May 8, 2023. Additionally, Defendant Fasolo currently serves as J&J's Chief Human Resources Officer and as a member of its Executive Committee, Management Compensation Committee, and Chair of its Pension and Benefits Committee. Thus, as the Company admits, he is a non-independent director as a result of his relationship to J&J. Additionally, he receives handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor

such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, as a J&J executive, he is beholden to the former controlling shareholder J&J, which controlled Kenvue for the majority of the Relevant Period and remains beholden to J&J due to his dependence upon J&J for his full-time employment and livelihood. For these reasons, Defendant Fasolo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Franklin follow. Defendant Franklin has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, she serves on both the Audit Committee and the Nominating, Governance & Sustainability Committee. Additionally, she receives handsome compensation for her time on the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, as a member of the Audit Committee she had a duty under the Audit Committee Charter to ensure the accuracy of the Company's quarterly reports, including the Q1 10-Q and Q2 10-Q, both of which contained false and misleading statements. For these reasons, Defendant Franklin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Godbole is futile follow. Defendant Godbole has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Godbole serves on the Audit Committee and the Nominating,

Governance & Sustainability Committee. Additionally, she receives handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, as a member of the Audit Committee she had a duty under the Audit Committee Charter to ensure the accuracy of the Company's quarterly reports, including the Q1 10-Q and Q2 10-Q, both of which contained false and misleading statements. For these reasons, Defendant Godbole breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Healey is futile follow. Defendant Healey has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Healey serves as the Chair of the Nominating, Governance & Sustainability Committee. Additionally, she receives handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Healey had specialized knowledge of the false and misleading statements at issue because of her extensive career experience and executive roles at Procter & Gamble, which also distributes medicines containing PE. Accordingly, Defendant Healey should have been acutely aware of the existing risks regarding PE that the Company and all Defendants failed to disclose. For these reasons, Defendant Healey

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.     Additional reasons that demand on Defendant Holden is futile follow. Defendant Holden has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Holden serves as the Chair of Compensation Committee. Additionally, she receives handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Holden breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.     Additional reasons that demand on Defendant Merlo is futile follow. Defendant Merlo has served as the Chair of the Board and Executive Committee since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Merlo receives handsome compensation. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Merlo previously served as the President and CEO of CVS Health and has specialized knowledge directly related to the false and misleading statements at issue in this Complaint. Defendant Merlo was aware or should have been aware based on his breadth of experience and knowledge of the risks that PE posed to many of Kenvue's brands such as Tylenol and Sudafed. Yet, Defendant Merlo allowed the Q1 10-Q and Q2 10-Q to omit

the ongoing risks of PE use in the Company's disclosures. For these reasons, Defendant Merlo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Prabhu is futile follow. Defendant Prabhu has served as a member of the Board since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Prabhu is the Chair of the Audit Committee. As a member of the Board, Defendant Prabhu receives handsome compensation. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, as the Chair of the Audit Committee, Defendant Prabhu had a duty per the Audit Committee Charter to ensure that the Company's financial statements were not materially false and misleading. Yet, Defendant Prabhu failed to ensure that the Q1 10-Q and Q2 10-Q disclosed the ongoing risk that PE use presented to the Company. Accordingly, Defendant Prabhu knew or should have known and failed to include necessary disclosures in the 10-Qs to make them not false and misleading. For these reasons, Defendant Prabhu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Sneed is futile follow. Defendant Sneed has served as a Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Sneed will receive handsome compensation. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Sneed worked as an Executive Vice President, Global Corporate Affairs and Chief Communications Officer at J&J from 2018 to 2022. As such, he is beholden to the former controlling shareholder. Thus, as the Company admits, his relationship to J&J makes him a non-independent director. Accordingly, Defendant Sneed's relationship to J&J prevented him from correcting any of the false and misleading statements made during the relevant period. Moreover, as the Chief Communications Officer at J&J for four years and during which time Kenvue brands were still under J&J, Defendant Sneed should have been acutely aware of the potential problems continued PE use presented to brands such as Tylenol and Sudafed. As such, Defendant Sneed either knew or should have known and failed to correct the Company's false and misleading statements and material omissions. For these reasons, Defendant Sneed breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Wolk is futile follow. Defendant Wolk has served as Company director since the closing of the IPO on May 8, 2023. As a member of the Board, Defendant Wolk will receive handsome compensation. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Wolk has worked as the Chief Financial Officer of J&J since 2018. Thus, as the Company admits, Defendant Wolk's relationship to J&J makes him a non-independent director. As such, he is beholden to the former controlling shareholder J&J. Accordingly, Defendant Sneed's relationship to J&J prevented him from correcting any of the

false and misleading statements made during the relevant period. Moreover, given that Defendant Wolk served as the CFO of J&J during the demerger of J&J and Kenvue, Defendant Wolk would have been intimately familiar and involved in the preparation of the separation. Accordingly, Defendant Wolk would have been aware of both the material risks that continued PE use presented to Kenvue and the Company's decision to omit such risk from the Registration Statement, Q1 10-Q, and Q2 10-Q. As such, Defendant Wolk either knew or should have known and failed to correct the Company's false and misleading statements and material omissions. For these reasons, Defendant Wolk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on the Board is futile follow.

145.    Additional reasons that demand on Defendants Fasolo, Mongon, Sneed, and Wolk is futile follow. Defendants Fasolo, Mongon, Sneed, and Wolk all have served or currently serve as Executives at the former controlling shareholder Johnson & Johnson. Thus, as the Company admits, all four directors are non-independent as a result of their relationships to J&J. All four defendants served together on the executive committee on J&J from 2018 to 2022. In the present, both Defendants Fasolo and Wolk continue to serve on the Executive Committee of J&J and as current executives. As executives of J&J, each of the four defendants should have been acutely aware of the ongoing issues with PE use given that all Kenvue brands were J&J brands during the entirety of their shared time at J&J from 2018 to 2022. Additionally, the FDA has been investigating the efficacy of PE since as early as 2007. Accordingly, Defendants Fasolo, Mongon, Sneed, and Wolk are beholden to each other based on the relationships they formed working together as executives. Moreover, each of these four defendants are beholden to J&J due to their previous or current executive positions at the Company. Defendants Fasolo, Mongon, Sneed, and

Wolk are also beholden to the former-controlling shareholder J&J because all four defendants were nominated to the board when J&J held 100% of voting power and confirmed to the Board when J&J held approximately 89% of the voting power. As a result, each of them was elected to the Board at the decision of J&J and each held the interest of J&J over the interest of Kenvue. For these reasons, demand is futile and therefore excused as to Defendants Fasolo, Mongon, Sneed, and Wolk.

146.    Additional reasons that demand is futile as to all eleven defendants on the Board. All eleven defendants were nominated and confirmed to the Board when J&J was the controlling shareholder of the Company. J&J named Defendant Mongon as the CEO designate as early as September 28, 2022. J&J nominated Defendant Merlo to be a director as early as January 4, 2023. Meanwhile Defendants Allison, Fasolo, Franklin, Godbole, Healey, Holden, Prabhu, Sneed, and Wolk were announced as directors in the Company's final May 4, 2023 Registration Statement and became effective following the closing of the IPO on May 8, 2023. Thus, each Director is beholden to the former controlling shareholder, who was largely responsible for the failure to disclose the long-known efficacy concerns associated with PE use. Given that each director was appointed by decision of J&J they each are beholden not to address the insufficient disclosures that J&J included in Kenvue's Registration Statement and in the demerger agreements. Moreover, J&J as controlling shareholder designed the director compensation plan that became effective on May 8, 2023. As such, each director explicitly benefitted from the former controlling shareholder and were thereby incentive not to report or correct any material omissions. For these reasons, demand is futile as to all eleven directors because they are beholden to the former controlling shareholder, and all failed to take the necessary corrective action required of them under Kenvue's Code of Conduct.

147.    Moreover, Defendants Allison, Franklin, Godbole, and Prabhu served as members of the Audit Committee during the Relevant Period. In violation of the Audit and Risk Committee Charter, the Defendants Allison, Franklin, Godbole, and Prabhu failed to adequately review and discuss the Company's Q1 10-Q and Q2 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Allison, Franklin, Godbole, and Prabhu further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

148.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and for waste of corporate assets. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

149.    Kenvue has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Kenvue any part of the damages Kenvue suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

150.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Kenvue's officers and directors, and these acts are incapable of ratification.

152.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Kenvue. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Kenvue, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

153.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Kenvue to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

154.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

155.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Kenvue's business and affairs.

157.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

158.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Kenvue.

159.     In breach of their fiduciary duties owed to Kenvue, the Individual Defendants willfully or recklessly caused the Company caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company faces potential headwinds because of the FDA's issued concerns about PE's ineffectiveness; (2) the Company did not discuss or disclose the risks related to the efficacy of PE in its IPO, even

though questions regarding its efficacy have been prevalent since 2007; (3) the Company failed to disclose specific risks relating to potential litigation stemming from adverse findings on PE; (4) the Company failed to maintain internal controls; and (5) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

160.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

161.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

162.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Kenvue's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

163.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

164.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kenvue has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

165.     Plaintiff, on behalf of Kenvue, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

166.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Kenvue.

168.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Kenvue that was tied to the performance or artificially inflated valuation of Kenvue, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

169.     Plaintiff, as a shareholder and a representative of Kenvue, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

170.     Plaintiff, on behalf of Kenvue, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Kenvue, for which they are legally responsible.

173.    As a direct and proximate result of the Individual Defendants' abuse of control, Kenvue has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Kenvue has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.    Plaintiff, on behalf of Kenvue, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Kenvue in a manner consistent with the operations of a publicly held corporation.

177.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Kenvue has sustained and will continue to sustain significant damages.

178.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

179.    Plaintiff, on behalf of Kenvue, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

182.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Kenvue to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

183.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184.    Plaintiff, on behalf of Kenvue, has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Mongon, Ruh, and Howlett for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

1.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

2.      As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Kenvue shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

3.      Federal law provides Kenvue with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

4.      The plaintiffs in the Securities Class Actions allege that the Registration Statement issued in connection with the Company's Offering contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

5.      Kenvue is the registrant for the Offering. Defendants Mongon, Ruh, and Howlett were responsible for the contents and dissemination of the Registration Statement.

6.      As issuer of the shares, Kenvue is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

7.      The plaintiffs in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

8.      Defendants Mongon, Ruh, and Howlett, because of their positions of control and authority as controlling shareholders, officers and/or directors of Kenvue, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Kenvue, including the wrongful acts complained of herein and in the Securities Class Actions.

9.      Accordingly, Defendants Mongon, Ruh, and Howlett are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution,

and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

10.     As such, Kenvue is entitled to receive all appropriate contribution or indemnification from Defendants Mongon, Ruh, and Howlett.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Kenvue, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Kenvue;

(c)     Determining and awarding to Kenvue the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Kenvue and the Individual Defendants to take all necessary actions to reform and improve Kenvue's corporate governance and internal procedures to comply with applicable laws and to protect Kenvue and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Kenvue to nominate at least six

candidates for election to the board; and

   3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

  (e) Awarding Kenvue restitution from the Individual Defendants, and each of them;

  (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

  (g) Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: January 5, 2024

     **THE BROWN LAW FIRM, P.C.**

     */s/ Elizabeth J. Donohoe*
     Elizabeth J. Donohoe
     Timothy Brown
     767 Third Avenue, Suite 2501
     New York, NY 10017
     Telephone: (516) 922-5427
     Facsimile: (516) 344-6204
     Email: edonohoe@thebrownlawfirm.net
       tbrown@thebrownlawfirm.net

     **BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
     Peretz Bronstein
     Eitan Kimelman
     60 East 42nd Street, Suite 4600
     New York, NY 10165
     Telephone: (212) 697-6484
     Facsimile: (212) 697-7296
     Email: peretz@bgandg.com
       eitank@bgandg.com

     *Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, Richard Berdan, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _5_ day of January, 2024.

_____
Richard Berdan